CONTINUATION

I, Salvatore Pizzo, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the PREMISES known as 538 Hamblin Ave W., Battle Creek, MI, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2. I am and have been an IRS-CI Special Agent since July 2024. I am currently assigned to the Detroit Field Office at the Grand Rapids Post of Duty in Michigan. My primary duties include investigating criminal violations of Title 26 (the Internal Revenue Code), Title 31 (the Bank Secrecy Act), and Title 18 (money laundering and related specified unlawful activities) of the United States Code. Prior to becoming an IRS-CI Special Agent, I received a four-year business degree, majoring in accounting fraud investigation from Davenport University in 2022 and worked as an accounts receivable and payable analyst from 2022 to 2023. My duties as an accounting analyst included recording the receipt of cash and payment of invoices, contacting vendors for prompt payment, processing customer returns, and managing inventory. After being hired as a Special Agent in December 2023, I attended the six-month Criminal Investigator Training Program ("CITP") and the Special Agent Investigative Techniques (SAIT) program at the Federal Law Enforcement Training Centers located in Glynco, Georgia. My training there included instruction on law enforcement and investigative techniques with an emphasis on Title 26 crimes including examining tax returns, forensic accounting, tax refund fraud, money laundering, and laws related to the execution of search and

seizure warrants. Over the course of my employment with IRS-CI, I have been involved in multiple investigations that included the use of surveillance, executing search warrants, interviewing witnesses, and tracing the proceeds of criminal activities.

3. The information in this affidavit includes facts known to me personally, as well as records obtained and facts related to me by other law enforcement officers and agents assisting with the investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. As further described below, Kevin CALDWELL has been indicted for mail fraud, false claims, and theft of public money, in violation of 18 U.S.C. §§ 1341, 287, and 641.

5. I submit there is probable cause to search the PREMISES described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B. The applied-for warrant would authorize the search of CALDWELL and the PREMISES and the seizure of records and information that constitute evidence and instrumentalities of violations of 18 U.S.C. §§ 1341, 287, and 641, (the "Target Offenses") as further described in Attachment B, those violations involving CALDWELL and occurring between January 1, 2022, and the present.

**PROBABLE CAUSE**

6. In January 2026, CALDWELL walked into the IRS Taxpayer Assistance Center in Grand Rapids, Michigan to hand-file his 2023 IRS Form 1040 (individual return). According to the return, the IRS owed him a tax refund of $8,190,000. CALDWELL submitted supposedly supporting documents, including a contract between himself and a fictitious real estate investment trust (REIT) called "Moundbuilders," and various tax forms related to his scheme.

7. In February 2026, CALDWELL mailed three IRS Forms 1120-REIT (for years 2023, 2024, and 2025) to the IRS service center in Ogden, Utah. He claimed to be the representative of "Moundbuilders," and the representative of a number of fictitious Indian tribal entities. With each return he submitted a "bill of exchange" in the form of a negotiable instrument, supposedly tendering payment of undistributed capital gains tax for the REIT. CALDWELL then claimed Moundbuilders had overpaid its tax on undistributed capital gains and demanded a refund each year. The total refund claimed in the final (2025) return was $24,570,000.

8. In March 2026, the IRS issued Moundbuilders a U.S. Treasury Check for $24,570,000, which CALDWELL negotiated at a brokerage firm. A representative of an associated financial institution contacted the IRS to inquire about the provenance of the check, which triggered this investigation. The financial institution restored more than $24 million of the fraudulently obtained funds to the IRS.

9. On Wednesday, September 2, 2026, a grand jury in this District returned an indictment charging Kevin CALDWELL with mail fraud in violation of 18 U.S.C. § 1341; false claims in violation of 18 U.S.C. § 287; and theft of public money in violation of 18 U.S.C. § 641. (Case No. 1:26-cr-93-PLM, R. 2: Indictment.)

10. During the investigation of these offenses, the brokerage that negotiated the Treasury check contacted the Inspector General for Tax Administration (TIGTA). They advised that CALDWELL had begun sending threatening messages accusing them of stealing "his" money. I have viewed communications CALDWELL sent the brokerage over Facebook, Instagram, and other social media, and confirmed that he identified himself as Kevin

CALDWELL and "Chief Kiel Mansa" in the messages. In some of the messages, CALDWELL claims "his" tax refund was stolen, and discusses various aspects of the scheme.

11. In his tax returns and communications with the IRS, and communications with the brokerage described above, CALDWELL used the email addresses info@moneyversefhc.com, templeoflove0@gmail.com, and kcaldwell.biz@gmail.com.

12. I have also viewed YouTube videos in which CALDWELL appears to be teaching "classes" about various financial topics. CALDWELL instructs followers about how to discharge debt by filing various tax documents, how to increase their wealth by investing in his alternative financial structures, and creating supposedly negotiable instruments.

13. I interviewed CALDWELL on August 28, 2026. He advised me that he had prepared the documents submitted to the IRS on his laptop computer, and said he would provide it to us to substantiate his claims. He also admitted that he had posted messages on social media criticizing the brokerage firm for "stealing" the tax refund. CALDWELL agreed to come back to the IRS TAC on Wednesday, September 9.

14. During my interview with CALDWELL, he was accompanied by his brother. CALDWELL advised that his brother had a trust set up as a beneficiary of Moundbuilders, but instructed me that his brother would not give any formal answers to questions I might ask. CALDWELL also told me he had 198 anonymous investors in Moundbuilders. I therefore have reason to believe that CALDWELL has other associates or co-conspirators in the scheme. In my training and experience, persons involved in such schemes use electronic devices to communicate with their co-conspirators by voice, text, social media, and encrypted messaging applications.

15. As part of the charged offense, CALDWELL submitted documents to the IRS relating to entities named Moundbuilders, Moneyverse Global Blockchain Tribe, Moneyverse Financial Holding Company, Love Nation, and the United Nations of Chippewa, Ottawa, and Potawatomi Indians, and the Kevin Caldwell Irrevocable Trust. CALDWELL advised me during his interview that he created these documents. I therefore believe that evidence of the creation of these documents will be on the devices, including templates obtained from or provided to co-conspirators, and metadata establishing the actual times of creation.

16. On September 8, 2026, this Court issued a warrant to search 183 West Street, Apartment 510, Battle Creek, Michigan, based on the same probable cause above (Docket No. 1:26-mj-363-SJB). This morning (September 9, 2026), I arrested CALDWELL on the warrant accompanying his indictment in Grand Rapids, Michigan. At the same time, a U.S. Postal Inspector and other law enforcement officers executed the search warrant in Battle Creek. The residence appeared to have recently been flooded, and the devices sought were not present.

17. After rights advisement, CALDWELL stated that he was actually living at 538 Hamblin Ave. W., Battle Creek, Michigan. I am aware that that residence is the address where the $24,570,000 refund check was mailed in March 2026. To my knowledge the house had been seized by the County, but CALDWELL confirmed that he was presently living there with another person he identified as his cousin. CALDWELL stated that his phone and laptop computer were at the residence now. He initially consented to the seizure of those devices, but then changed his mind and revoked consent. Based on this conversation, I submit there is probable cause to believe the devices are at the PREMISES, which has been secured pending this application for a warrant.

**ELECTRONIC DEVICES AND FORENSIC ANALYSIS**

18. As described above and in Attachment B, this application seeks authorization to search for and seize records and information that might be found on the person of CALDWELL and the PREMISES, in whatever form they are found. One form in which the records and information might be found is data stored on an electronic device. Thus, the warrant applied for would authorize the search and seizure of electronic devices and the seizure or copying of electronically stored information, all under Rule 41(e)(2)(B).

19. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic devices and electronically stored information that reasonably could contain records and information described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may involve techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the medium to inspection to identify items that are seizable under the warrant.

20. In addition to the information provided above, I submit that there is probable cause to believe that records and information described in Attachment B are likely to be stored on electronic devices found on the person of CALDWELL and the PREMISES, and may be identified through forensic examination, for reasons including the following:

a) Based on my knowledge, training, and experience, I know that electronic files and information and remnants of files and information can be recovered months or even years after they have been stored on or deleted from an electronic device or viewed via the Internet. Information can be stored at little or no cost. Even when information has been deleted, it sometimes can be recovered months or years later using forensic tools. This is so because,

typically, when a person "deletes" a file or information, the operating system may not immediately erase the data; instead, the system may instead remove the pointer or reference that links the file's location within the device's storage medium. Some or all of the deleted data may then remain on the storage medium until it is overwritten by new data.

b) Additionally, in modern operating systems, a piece of information (e.g., text message, notification, photo, or location coordinates) may be written to several locations on the electronic device. When the primary item (e.g., a text message) is deleted, the other copies of the data may be unaffected and remain long after the deletion of the primary item.

c) In addition to user-generated files, electronic devices contain records that can help demonstrate how the device was used, what it was used for, and who has used it. Operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or page files can all be useful in answering such questions. Some of this information is routinely recorded by the operating system or by applications as part of a device's normal functioning. Electronic device users typically do not erase or delete this evidence, because specialized software is usually required for that task.

d) Additionally, most current operating systems (such as iOS, Android, and Microsoft Windows), as well as individual applications, routinely include features that utilize cloud services to synchronize data across multiple electronic devices linked to the same user account or service. These synchronization features—often enabled by default—can provide access to files, internet activity, photos, emails, text messages, and other forms of electronically stored information from any of the user's electronic devices. For example, when an iPhone user takes a photograph with their phone, the photo can be nearly instantaneously synchronized across all their linked Apple devices (e.g., iPad, laptop, desktop) that are connected to the same Apple

account. This synchronization functionality means that evidence within the parameters of Attachment B created on one device but subsequently deleted may still reside on other electronic devices if those devices have not yet received or processed the deletion signal or synchronized the update.

21. Forensic evidence. As further described in Attachment B, this application seeks permission to search for and to seize both records that serve more directly as evidence of the Target Offense(s) and forensic electronic evidence that establishes how electronic devices storing any such records were used, the purpose of their use, who used them, and when, as is relevant to the records described previously. Forensic electronic evidence also can help to identify and locate additional evidence of the Target Offense(s). There is probable cause to believe that such forensic electronic evidence will be on electronic devices on the person of CALDWELL in the PREMISES because:

a) Data on the electronic device can provide information about a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs, among others, store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic device was in use. Electronic device file systems can sometimes record information about the dates files were created and the sequence in which they were created.

22. Additionally, some information stored on an electronic device may provide evidence relating to the physical location of other evidence or suspects. For example, an image

stored on a device may have geolocation information incorporated into its file data. Such file data also may contain information indicating when the file or image was created. Information from such image files, along with external device connection logs, may also indicate the use of additional electronic storage media that may contain evidence of the Target Offense(s) (e.g., a digital camera or cellular phone with an incorporated camera).

23. Additionally, information stored on an electronic device may provide relevant insight into the device user's state of mind as it relates to the Target Offense(s). For example, information on the electronic device may indicate the user's motive and intent to commit fraud (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

24. As explained herein, based on my training and experience, I know that certain file types, artifacts, automatic processes, logs, and deleted information may require the use of additional forensic and contextual analysis to: (a) evaluate whether forensically recovered information falls within the parameters of Attachment B and (b) identify and understand both inculpatory and exculpatory information on the electronic device.

25. Timestamps, compound files, and databases: I know through my training and experience and my communications with forensic experts that different electronic device operating systems and programs use multiple "timestamps" for information stored within devices. As further described below, these timestamps can be altered by automated processes. Because electronic devices employ timestamps to facilitate the functioning of the operating system or program, the timestamps for a particular file may present in idiosyncratic ways that require further analysis to understand. For example, operating system and application updates

for electronic devices can change timestamps for information stored on the electronic device and can alter where information is stored on the device and the directories and databases associated with the information.

26. Also based on my training and experience and my communications with forensic experts, I know that electronic devices can contain databases and other compound files. A database or a compound file, such as a .rar or .zip file, will have timestamps for the container file, but also may contain many other files, data or logs, each with additional timestamps. I know that additional forensic and contextual analysis is often necessary to understand whether information contained in databases and compound files falls within the parameters of Attachment B.

27. Information for which no timestamps exist: Additionally, some information in current operating systems is often stored in formats that lack timestamps. For example, as discussed above, when information is deleted from an electronic device, current operating systems do not immediately erase the data. I understand that, depending on the operating system and electronic device, timestamps associated with deleted information may have changed or have been removed when that information was deleted. Advanced forensic tools and contextual investigation may help analysts and investigators understand whether deleted information that is forensically recovered falls within the parameters of Attachment B.

28. User attribution information: In my training and experience, information stored on an electronic device (e.g., registry information, communications, images and videos, transactional information, records of session times and durations, internet history, anti-virus, spyware, and malware detection programs) can provide information about the use and control of the electronic device that is relevant to the Target Offense(s) and the authentication of evidence

stored on the electronic device. This "user attribution" information can provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

29. User attribution evidence for electronic devices can be closely akin to evidence showing "indicia of occupancy" in the context of the execution of a residential search warrant. Information about the use or control of an electronic device can be highly relevant evidence in a criminal investigation.

30. Electronic device activity can indicate who used, owned, or controlled the device at times that are relevant to the Target Offense(s). For example, as described herein, many electronic devices contain logs of user account session times and durations, device activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the electronic device accessed networks and the Internet. Such information can inform the chronological context of electronic device access, use, and events relating to the investigation of the Target Offense(s). In addition to showing use and control of the electronic device, such user-attribution information can be relevant to authenticating evidence obtained from the device. Similarly, the existence or absence of anti-virus, spyware, and malware detection programs may be used to explain the likelihood that the computer was remotely accessed, addressing claims of how a record got on the electronic device.

31. Some types of information that can be strongly indicative of use or control of an electronic device include:

a) Set up or registry information. I know in my training and experience that when users purchase or acquire an electronic device, as part of the device set up, the user will

typically enter their name, a "recovery" email address, an associated account if any (e.g., an Apple account (for iPhones or other devices that use the iOS operating system), Google account (for Android cellular phones), or a Microsoft account (for a device running Windows)), country, time zone, language, and sometimes an associated credit card number.

b) In addition, in my training and experience, I know that electronic device users typically modify the "wallpaper," "home screen," or "desktop" of electronic devices soon after acquiring the devices. Second, I know in my training and experience that electronic device users often customize the "wallpaper," "home screen," or "desktop" of electronic devices with images of themselves, or other persons, places, or things that are important to the device user. Such images are typically visible every time the user accesses the electronic device and are strongly indicative of use and control.

c) The "contacts" or "address book" on an electronic device can be strongly indicative of who uses and controls the device. Such contacts are often set up as soon as the user acquires the device (sometimes automatically by the vendor, through synchronization with an existing account, or through another process (e.g., "Airdrop" with iPhones)) and are added to incrementally over time.

32. I know that when an individual uses an electronic device to commit fraud, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to engage in criminal activity of the kind described above may contain: data that is evidence of how the device was used; data that was

sent or received; information as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

33. Necessity of seizing or copying entire electronic devices. In many cases, a thorough search of a premises for information that might be stored on electronic devices will require the physical seizure or copying of electronic devices and later off-site review consistent with the warrant. In lieu of removing electronic devices from the premises, it is sometimes possible to make a copy or forensic image of electronic devices. Forensic imaging can often take a comprehensive electronic picture of the computer's data, including hidden sectors and deleted files. Similarly, an extraction of a cell phone can often make an extensive copy of the cell phone's data. Either physical seizure of or copying data from an electronic device is often necessary (in addition to or instead of on-site review) because these techniques help to enable the review of data stored on the electronic device and prevent the loss of the data from either accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed and analyzed on site in a timely manner. Analyzing evidence of how an electronic device has been used, what it has been used for, and who has used it may require considerable time, and taking that much time on premises could be inefficient or even unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine electronic devices with special tools and expertise, and potentially for a substantial amount of time, to obtain such evidence. Electronic devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months,

depending on the volume of data stored, and would be impractical and possibly unduly intrusive to attempt on site.

b) Technical requirements. Electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic devices available makes it difficult to know before a search what tools or knowledge will be required to search for evidence on electronic devices at the Premises. However, taking the electronic device off site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site review using specialized forensic tools.

## CONCLUSION

34. I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.